IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| OSAMU KUROTAKI, | Civil No. 22-00063 MWJS-WRP |
| Plaintiff, | ORDER ON DEFENDANT'S MOTIONS IN LIMINE NOS. 3 AND 4 |
| vs. | |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants. | |

## INTRODUCTION

Osamu Kurotaki, a Japanese national and U.S. legal permanent resident, allegedly failed to report several foreign bank accounts to the Internal Revenue Service (IRS). The IRS generally requires all "U.S. persons"—a category that includes legal permanent residents—to report such accounts. In this suit, the government seeks to hold Kurotaki liable for monetary penalties for his failure to do so. But Kurotaki asserts that he should not be penalized because he did not willfully fail to file the reports; he claims instead that he acted in reliance on an erroneous Japanese translation of that requirement in a letter from his accountant, and so he incorrectly believed he was exempt from reporting his foreign bank accounts.

Trial is scheduled to begin on December 9, 2024. In advance of trial, the government filed four motions *in limine* seeking pretrial rulings on certain evidentiary

disputes.  Kurotaki did not oppose the first of the motions, and at a hearing on these motions, the parties reached a compromise as to the second.  The Court therefore orally granted those motions based on the parties' shared understandings.  The Court now rules on the government's Motions *in Limine* Nos. 3 and 4.

The Court assumes the reader's familiarity with the underlying facts of this matter and refers to background information only as necessary to resolve the issues presented in the pending motions.  Moreover, as the parties are aware, *in limine* rulings are provisional.  *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).  While the parties must therefore comply with these rulings so long as they are in place, the parties may ask the Court to revisit them later at trial.

<u>DISCUSSION</u>

**A.    Defendant's Motion *in Limine* No. 3 [ECF No. 87]**

In its third motion *in limine*, the government seeks to preclude Kurotaki from offering evidence about (1) his Japanese legal residency status and (2) the distinction between two different Japanese characters, both of which allegedly mean "resident," but supposedly contain significant linguistic nuances.  For the reasons detailed below, the Court GRANTS the motion in part and DENIES the motion in part.

To preview the Court's rulings upfront:  Kurotaki may testify that he lived and spent most of his time in Japan during the timeframe at issue as a matter of *fact*, and he may even, in a limited way, use the word "resident" to convey that fact.  But he cannot

2

offer evidence or argument about his residency status in Japan as a matter of *law*.  And

as for the linguistic issue, Kurotaki may offer lay testimony about his *subjective*

understanding of what the two different Japanese characters meant to him, but he

cannot argue that the words have specific meanings as a more *objective* matter.

   1.   Before turning to the particulars of the parties' arguments, some legal

background will be helpful.  Under the Bank Secrecy Act of 1970 and its implementing

regulations, U.S. legal permanent residents (among others) who have bank accounts in

foreign countries with an aggregate balance of more than $10,000 must file an annual

report, known as a Report of Foreign Bank and Financial Accounts (FBAR).  *See* 31

U.S.C. § 5314(a); 31 C.F.R. § 1010.350; *see generally Bittner v. United States*, 598 U.S. 85, 88-

89 (2023).  If a taxpayer fails to file an FBAR when they should have, the Secretary of the

Treasury "may impose a civil money penalty."  31 U.S.C. § 5321(a)(5)(A).  The amount

of that penalty depends on whether the violation was willful or not.  If the taxpayer was

not willful in their violation, then the penalty "shall not exceed $10,000."  *Id.*

§ 5321(a)(5)(B).  But when the violation was willful, the maximum penalty is the larger

amount of either $100,000, or 50 percent of the relevant account's balance.  *Id.*

§ 5321(a)(5)(C)&(D).

   In this case, the government seeks only the most significant penalties—those that

attend to willful violations.  The government must therefore prove by a preponderance

of the evidence that Kurotaki was "willful" in violating the FBAR requirements.  It may

do so in any of three ways:  by showing that Kurotaki was either (1) knowing and intentional, (2) willfully blind, or (3) reckless when failing to file his FBAR.  *See United States v. Hughes*, 113 F.4th 1158, 1160 (9th Cir. 2024) (holding that "willfulness can be shown by proof of objective recklessness as well as subjective intent" (cleaned up)).

To prove a knowing and intentional violation, the government must show Kurotaki's subjective knowledge and intent.  Willful blindness, too, contains a subjective component:  under that theory, the government must prove that Kurotaki "(1) subjectively believed there was a high probability that a fact exists and (2) t[ook] deliberate actions to avoid learning of that fact."  *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1083 (S.D. Cal. 2021).  The recklessness theory, by contrast, is an objective one: the government must prove that Kurotaki (1) "clearly ought to have known that there was a grave risk that the filing requirement was not being met," and (2) "was in a position to find out for certain very easily."  *Hughes*, 113 F.4th at 1162 (quoting *Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018)).

2.    At trial, one of Kurotaki's principal defenses will be that he was not willful in failing to meet his FBAR requirement.  He wishes to testify and argue that he lived almost entirely in Japan during the relevant time period, and he therefore did not think of himself as a resident of the United States (despite holding a green card, which made him a legal permanent resident).  And he will point to the fact that his accountant provided him with a tax questionnaire form, translated from English into Japanese,

which—according to the unchallenged translation back into English—advised him that

FBAR obligations extended to U.S. "resident" taxpayers only.  *See* ECF No. 50, at

PageID.2044-45 (Order Denying Defendants' Motion for Summary Judgment).

The government accepts that Kurotaki may testify about the fact that he

principally lived in Japan during the relevant timeframe.  But in its Motion *in Limine*

No. 3, the government seeks to preclude Kurotaki from taking the further step of

asserting or arguing that he was, in a legal sense, a resident of Japan.  This core aspect of

the government's motion is surely correct.  Kurotaki has not designated himself or

anyone else as an expert in Japanese law; he therefore has no competent witness who

can testify about the legal ramifications of Kurotaki having spent as much time in Japan

as he did.  And at the hearing on this motion, Kurotaki's counsel did not take issue with

the government's argument, but instead conceded that he would not seek to offer

testimony or argument on this point.  The Court therefore GRANTS the government's

motion in this respect.

The matter becomes more complicated, however, once we move beyond this core

argument.  In the government's view, Kurotaki should also be precluded from using the

word "resident" or "resided" in his testimony altogether and Kurotaki's counsel should

be precluded from using these words in argument.  As the government sees it, allowing

Kurotaki to testify that he was a Japanese resident—even if meant in the colloquial

sense—would risk misleading  the jury into believing that Kurotaki was a Japanese

resident in a legal sense. This, the government fears, would have the effect of undermining any ruling precluding Kurotaki from directly asserting his Japanese legal residency status.

The Court declines to take its ruling that far. Kurotaki must be given room to testify and argue that the word "resident" is naturally understood to refer to living in a place and that he subjectively understood the word in that sense. Indeed, that is the only way Kurotaki will be able to tee up his central argument that his accountant's translated tax questionnaire—which, as noted, limited FBAR obligations to U.S. "resident" taxpayers—led him to conclude that the obligation did not apply to him. Put differently, it is appropriate for Kurotaki to testify that he did not believe he was, as a colloquial matter, a resident of the United States because he considered himself, again speaking colloquially, a resident of Japan. And he should be allowed to argue that this perception of residency was not only his subjective understanding, but an objectively reasonable understanding of that term as well. *Id.* at PageID.2045 (Order Denying Defendants' Motion for Summary Judgment) (acknowledging that "Kurotaki's understanding of the word 'resident'—at least in a non-technical and colloquial sense—is reasonable"). So long as Kurotaki does not testify or argue that he was a resident of Japan in a legal sense, he will not run afoul of the Court's ruling. To put it in the language of Federal Rule of Evidence 403, the probative value of Kurotaki's

testimony—so long as he hews carefully to the Court's ruling—is not substantially outweighed by the danger of unfair prejudice or of misleading the jury.

The government rejoins that Kurotaki's accountant used the word "resident" in the legal sense—that is, as someone who is *legally* a U.S. resident taxpayer. *See* ECF No. 87, at PageID.2375. And so, the government contends, it would be confusing for Kurotaki to use the word "resident"—whether of the United States or Japan—in a colloquial sense. But it is precisely this potential linguistic confusion between the two senses of "resident" that Kurotaki properly seeks to rely on in his defense. Whether Kurotaki's accountant meant "resident" in the legal sense, and whether it was objectively reckless to view it any differently, are factual matters for the jury to resolve based on all the evidence presented. Indeed, the only way the jury will be able to appreciate the significance of Kurotaki's argument is if the jury is informed that Kurotaki understood "resident" to refer to its colloquial sense—that is, to the fact of living or residing in a place.

To the extent the government's Motion *in Limine* No. 3 seeks to preclude Kurotaki from testifying or arguing that he was a resident of Japan—and not of the United States—in a purely colloquial sense, the motion is DENIED in that part. The motion is also DENIED to the extent that it seeks to preclude Kurotaki from sharing his colloquial understanding of the word "resident" with the jury.

The Court does agree with the government on one limited part of that point, however.  If the word "resident" were used too liberally in demonstratives or in argument—especially if used without appropriate context making clear that the word is being used in its colloquial sense—it would have the potential to confuse the jury. Accordingly, Kurotaki's counsel is instructed to use phrases such as "lived in Japan," "stayed in Japan," and so forth, rather than "resided in Japan" or "resident of Japan," wherever possible.  And if Kurotaki testifies that he was a Japanese resident or that he resided in Japan—which might not be entirely avoidable, as Kurotaki will testify through an interpreter who might sensibly use the word "resident" in a colloquial sense while interpreting—Kurotaki's counsel should endeavor to have Kurotaki clarify that he means "resident" only in the sense that he lived there as a matter of fact.  The Court cautions Kurotaki that if these instructions are not carefully followed, a limiting or curative instruction may become proper.

With the above understandings, this first aspect of the government's Motion *in Limine* No. 3 is GRANTED in part and DENIED in part.

3.   Through its Motion *in Limine* No. 3, the government separately seeks to exclude evidence of Japanese "linguistics or semantics."  ECF No. 87, at PageID.2372. As noted above, Kurotaki's defense centers around his understanding of the FBAR tax questionnaire form that his accountant provided him, which advised him that FBAR obligations extended only to U.S. "resident" taxpayers.  *See* ECF No. 40-17, at

8

PageID.599.  In addition to testifying that he believed he was not a resident of the
United States because he lived most of the time in Japan, Kurotaki wants to take the
further step of offering semantic or linguistic testimony about Japanese words.
Specifically, Kurotaki wishes to testify that the word his accountant used in the
Japanese version of the tax questionnaire form, "*kyojūsha*," means resident in the
colloquial sense—that is, residing or living in a particular place.  Kurotaki seeks to
testify that because the FBAR questionnaire used that word, he thought he did not have
to file an FBAR since he did not live in the United States most of the time.  He contends
that he would have known he had to file an FBAR if his accountant had used a different
word, "*eijūsha*," which, according to Kurotaki, means something akin to a legal
resident—that is, someone, like Kurotaki, who holds legal permission to reside in a
country even if they do not actually live or spend much of their time there as a matter of
fact.

The government seeks to preclude this entire line of testimony and argument.  It
offers two grounds for doing so:  (1) Kurotaki would need to call an expert to offer this
proposed testimony, and (2) Kurotaki did not provide sufficient pretrial notice of any
intention to present testimony—expert or otherwise—about the meaning of foreign
language terms.  As explained below, the Court agrees that Kurotaki would need to call
an expert to offer any objective translation of the two Japanese words and their
objective meanings, and he has failed to retain and notice an expert on that topic.  But

the Court disagrees with the government that all testimony on this issue should be

precluded, and it will permit Kurotaki to offer limited testimony on his subjective

understanding of these terms.

a.   As a general rule, if a party wishes to present an English translation of a

foreign language document or recording at trial—and if the accuracy of that translation

is not stipulated to—the party must call a qualified expert who can opine that the

translation is accurate.  *United States v. Abonce-Barrera*, 257 F.3d 959, 964 (9th Cir. 2001).

Of course, the necessary expertise can arise merely from a sufficient proficiency in using

that foreign language.  *Id.* (relying, in part, on the fact that proffered expert's "native

language" was Spanish).  There is no need to be a professor of languages to be a

qualified language expert; one can obtain expertise in a foreign language through the

school of experience, so to speak, so long as that experience provides a basis for offering

specialized opinions about nuances in that language.

But what happens when a party to a case is a native speaker in a foreign

language?  Are they allowed to offer their own opinions about the meaning of foreign

words in a document?  The Ninth Circuit has explained that "[g]enerally, evidence of

[an expert's alleged] bias goes toward the credibility of a witness, not [their]

competency to testify, and credibility is an issue for the jury."  *Id.* at 965.  So it may be

permissible for a party fluent in a foreign language to designate themselves as an expert

in that language.

10

b.   In this case, the parties do not disagree over the proper translation of any

foreign language document; to the contrary, they accept a translation of the relevant tax

questionnaire that limits FBAR obligations to "U.S. resident taxpayers."  Kurotaki

nonetheless seeks to testify about the Japanese word underlying this translation, as well

as a different Japanese word that does not appear in the Japanese language version of

the FBAR questionnaire.  According to Kurotaki, these two Japanese words are both

properly translated as "resident," but have different linguistic connotations.

In proffering this testimony, Kurotaki effectively offers himself up as an expert

on the Japanese language.  He seeks to offer the expert opinion that his accountant's tax

questionnaire form used a Japanese word for "resident"—*kyojūsha*—that connoted a

colloquial meaning of actually living in a place.  And he seeks to further opine that if his

accountant had instead used a different Japanese word for "resident"—*eijūsha*—he

would have understood the FBAR requirements to include someone, such as himself,

who is a legal permanent resident of a country.

It is at least conceivable that Kurotaki could have qualified as an expert because

he is a native Japanese speaker; the fact that he has an obvious interest in the outcome

of this case would not necessarily preclude him from performing that role.  *See Abonce-

Barrera*, 257 F.3d at 964-65.  The problem is that he did not designate himself as an

expert or provide an expert report by the relevant deadline for expert witnesses, as

required by Federal Rule of Civil Procedure 26(a)(2).  Had he done so, the government

could have retained its own expert to take issue with Kurotaki's linguistic evidence. But because he did not provide that notice, the government did not retain its own expert. It would, therefore, severely prejudice the government to allow Kurotaki now to go forward as an expert anyway. And Kurotaki has offered no justification, let alone a substantial one, for his failure to provide the required notice.

Kurotaki therefore faces the daunting standards of Federal Rule of Civil Procedure 37(c)(1), which generally provides that if a party fails to provide information required by Rule 26(a), they may not use that information at trial. And while substantial justification and harmlessness are two exceptions that "ameliorate the harshness of Rule 37(c)(1)," it is "the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with Rule 26 was either justified or harmless." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106-07 (9th Cir. 2001) (cleaned up). Kurotaki makes no attempt at this showing, nor could he.

Four factors "guide the determination of whether substantial justification and harmlessness exist, including (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence." *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022) (cleaned up). Although the Court does not find that Kurotaki acted in bad faith or willfully in failing to provide expert notice here, the Ninth Circuit has made clear that "exclusion is an

appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)," even when there is no "showing in the record of bad faith or willfulness." *Yeti by Molly*, 259 F.3d at 1106. And the remaining factors weigh heavily against Kurotaki. The government would be both prejudiced and surprised by expert testimony at this late stage. The government could not easily cure the prejudice now—the only conceivable way for the government to retain its own linguistics expert would be for the Court to continue the trial date, which itself would cause harm. *See Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005) ("Disruption to the schedule of the court and other parties in that manner is not harmless.").

The Court therefore agrees with the government that Kurotaki must, at this point, be precluded from offering expert testimony about the meaning of Japanese words. To the extent the government's Motion *in Limine* No. 3 seeks this result, it is GRANTED as to that part.

c.  Kurotaki contends, in the alternative, that he should be permitted to offer at least some testimony about the meaning of the Japanese words as a lay witness, rather than as an expert. Neither party identifies any case authority permitting or precluding a lay witness from offering lay opinions about the meaning of foreign words, and there appears to be a surprising dearth of precedent on this question. Some guidance can be gleaned from a different body of case law, however:  precedents concerning lay opinion

13

testimony on the meaning of code words in criminal investigations—which are
sometimes in foreign languages.

In the Ninth Circuit and elsewhere, the interpretation of code words encountered
during criminal investigations can be the subject of either lay or expert testimony,
depending on the nature of the testimony offered.  In determining whether a witness
may provide lay or expert testimony, courts look at both the substance or content of the
proffered testimony and the method through which a witness acquired their knowledge
or understanding of certain words.

When a witness has obtained their knowledge of code words through their
extensive professional experience working on a variety of cases—and when they are
therefore offering opinions about what words commonly mean—their testimony
generally must come in the form of qualified expert opinion.  *See United States v. Vera*,
770 F.3d 1232, 1241 (9th Cir. 2014).  In criminal investigations, expert witnesses offering
translations of code words or jargon develop their knowledge over time and in a
specialized way—for instance, they might draw on their prior investigations, conduct
research, expand their vocabulary, or consult other colleagues to show their
qualifications of understanding certain code words.  *See United States v. Rivera*, 442 F.
Supp. 2d 274, 278-79 (E.D. Va. 2005); *see also United States v. Freeman*, 498 F.3d 893, 901
(9th Cir. 2007) ("Drug jargon is a specialized body of knowledge, familiar only to those
wise in the ways of the drug trade, and therefore a fit subject for expert testimony."

14

(cleaned up)).  Experts in criminal jargon are therefore permitted to offer expert testimony as to their interpretations of code words based on their specialized knowledge and background because their methods can be objectively verified and evaluated.  *See United States v. Smith*, 919 F.3d 825, 835-36 (4th Cir. 2019) (holding that an agent was properly qualified as an expert and had reliable methodology where he "was a twelve-year veteran of the FBI with substantial experience in drug and gang investigations (conducting controlled buys, interviewing drug dealers and gang members, using gang members as confidential sources, listening to thousands of recorded conversations, and so forth)" and could be viewed as an expert similar to "a foreign-language interpreter or an anthropologist who studies a group by educating himself and conducting fieldwork").

But there are occasions when it is appropriate to admit lay opinion testimony on the interpretation of code words encountered in criminal investigations.  That typically happens when a law enforcement officer proposes to testify about how a person or a particular group of people have been using coded language.  *See Vera*, 770 F.3d at 1242. The question such a witness answers is this:  what did this person or these particular individuals mean when they used a word in a specific context?  And courts have recognized that lay witnesses may offer that kind of testimony because it does not require expertise—it only requires experience with, or observation of, a particular person or group.  *See Freeman*, 498 F.3d at 902; Fed. R. Evid. 701 (requiring that lay

opinion testimony must be "based on the witness's perception," helpful to the jury's

"understanding [of] the witness's testimony or to determining a fact in issue," and "not

based on scientific, technical, or other specialized knowledge"). So, for example, a

police officer who spends forty hours a week observing drug traffickers might pick up

on slang or code words used within that group, and the officer's understanding of the

meaning of those code words would properly be the subject of lay opinion testimony.

*See United States v. Perez*, 962 F.3d 420, 437 (9th Cir. 2020). And that can be true even

when the code words are in a foreign language. *See, e.g.*, *United States v. Jayyousi*, 657

F.3d 1085, 1101-04 (11th Cir. 2011) (affirming the admission of a special agent's lay

opinion testimony about how particular persons were using code words, including

words in Arabic).

Turn back now to Kurotaki's proposed testimony. To the extent he merely

proposes to testify about *his* understanding of the two Japanese words at issue, that is

an appropriate subject for lay opinion testimony. That is true because, just like the

witnesses who offer a lay testimony explanation of jargon or code words in the context

of a particular criminal investigation, Kurotaki may explain what these Japanese words

meant *to him* in the context that he was reading them.

Kurotaki's own subjective understandings of the Japanese words is not only an

appropriate topic for his own lay opinion, but it is also highly relevant in this case. That

is because the government seeks not only to prove that Kurotaki was *objectively* reckless

16

in failing to file FBARs, but also that Kurotaki *subjectively* knew he should have done so and, moreover, was willfully blind in failing to file. Under these latter theories of mens rea, Kurotaki's subjective understanding of the FBAR requirements is squarely in dispute. And his own subjective understanding of different Japanese words for "resident" is therefore fundamental to his defense that he was not willful—under the subjective theories of mens rea—in failing to file his FBAR.

The flipside of the coin, however, is that Kurotaki may *not* offer expert testimony on the *objective* meaning of the Japanese words at issue. As noted, he has not proffered any technical expertise or background on Japanese linguistics that would allow him to offer his opinion on what these particular words mean more broadly or as an academic matter. And, in any event, as explained above, he failed to provide timely expert notice, and it is therefore too late for him to purport to qualify himself as one.

Furthermore, the Court will not permit Kurotaki to introduce extrinsic evidence on the meaning of Japanese characters, such as his proposed demonstrative exhibits containing dictionary definitions of the two characters, because that evidence veers into the realm of expert testimony. Although Kurotaki may testify as a lay witness about his own subjective understanding of the characters, only an expert witness could lay a foundation for such an exhibit purporting to provide a common, objective, or generally accepted definition of Japanese words.

The government urges the Court to preclude all testimony on these two words, arguing that it will be severely prejudiced by *any* testimony from Kurotaki on this topic. In the government's view, even Kurotaki's subjective opinion on the meaning of the words would be unfairly prejudicial because he never raised this specific argument at his deposition or at the summary judgment stage. The Court is not convinced. At his deposition, Kurotaki testified in Japanese, with the aid of an interpreter. He *did* point out that he took the Japanese word in his accountant's tax questionnaire to mean an actual resident rather than merely a green card holder. *See* ECF No. 98-1, at PageID.2738. Given that Kurotaki was looking at the Japanese-language version of the questionnaire and testifying in Japanese, it is quite possible that he was identifying the very Japanese words that he now wishes to testify about at trial. And at that deposition, the government chose not to further inquire into Kurotaki's subjective understandings or the reasons why the Japanese words might have struck him the way they did. Kurotaki should not now be precluded from fully explaining the reasons for his subjective understandings at trial merely because the government did not squarely ask him follow-up questions about those topics during his deposition. And, of course, at trial, the government will have the opportunity to cross-examine Kurotaki on his subjective understanding of the Japanese characters and attack his credibility overall.

Kurotaki may therefore testify about *his* understanding of the Japanese words *kyojūsha* and *eijūsha*. But the Court cautions Kurotaki that his testimony must comport

18

with this Court's ruling—he must limit his testimony to statements along the lines of "this is what this character means to me." Kurotaki is not permitted to testify that the ordinary or typical Japanese speaker would understand the words in the same way, or to otherwise imply that his understanding of the characters is objectively correct. He will not be permitted, for example, to testify that "this is what this character means." And Kurotaki is cautioned that if his testimony and argument do not carefully comply with this ruling, a limiting or curative instruction could become necessary.

For these reasons, and with these understandings, the government's Motion *in Limine* No. 3 is GRANTED in part and DENIED in part as outlined above.

### B.    Defendant's Motion *in Limine* No. 4 [ECF No. 88]

At trial, Kurotaki also intends to present evidence that "in Japan and other Asian countries[,] banking transactions are authorized by seals called Hanko or Ginko-In instead of by signature." ECF No. 88, at PageID.2382. The government generally does not challenge the admissibility of evidence that this practice exists. But in its Motion *in Limine* No. 4, the government specifically seeks to preclude Kurotaki from contending that "the Japanese practice of using Hanko and Ginko-In by itself *necessarily means as a matter of law*" that he lacked signature or other authority over accounts at issue. *Id.*

1.  The government's motion concerns one of the elements it must prove at trial. As common sense would suggest, taxpayers have no obligation to file FBARs for accounts in which they have no interest and over which they have no authority. To

show that Kurotaki should have filed FBARs, the government must prove—among

other things—that Kurotaki either (1) "had a direct financial interest in a foreign

account," or (2) "served as a signatory or had other authority over a foreign account."

*United States v. Pomerantz*, No. C16-0689, 2017 WL 2483213, at *5 (W.D. Wash. June 8,

2017); *see* C.F.R. § 1010.350(e) & (f).

    As to the latter option, the regulatory definition of "[s]ignature or other

authority" includes "the authority of an individual (alone or in conjunction with

another) to control the disposition of money, funds or other assets held in a financial

account by direct communication (whether in writing or otherwise) to the person with

whom the financial account is maintained."  31 C.F.R. § 1010.350(f)(1).[1]

    2.  As noted, the government accepts that "Hanko and Ginko-In seals may be

referenced at trial just because of the nature of this case."  ECF No. 88, at PageID.2382.

Indeed, the government allows that Kurotaki may "argue generally that he did not have

authority (alone or in conjunction with another) to control the disposition of the

accounts' assets, and as part of this defense he would be able to contend that he did not

have authority to use the Hanko or Ginko-In seals of his companies."  *Id.*  But the

government moves to preclude Kurotaki from arguing or offering evidence that the

---

[1]    As to the former option, the government argues that Kurotaki has stipulated to
facts that establish his financial interest in many of the accounts at issue as a matter of
law.  The Court has authorized Kurotaki to submit a supplemental brief on the financial
interest issue and will resolve it in a future order.

20

Japanese practice of using seals precluded him, as a matter of law, from having

signature or other authority over the accounts at issue.

For his part, Kurotaki disclaims any intention to make any argument or offer any

evidence to the effect that the Japanese practice of using seals precludes signature or

other authority as a matter of law.  And he recognizes that the government's

acknowledgements about the permissible uses of this evidence are "generous enough to

accommodate most of the testimony or evidence that could relate to the motion in

limine."  ECF No. 99, at PageID.2743.  Kurotaki nonetheless opposes the government's

motion because of a concern that it would "unfairly deny [him] the opportunity to

argue his understanding of the term 'signature or other authority' from the perspective

of a Japanese person."  *Id.*  In Kurotaki's view, "it is essential" for him "to be able to

illustrate through testimony how the use of these seals in banking in Japan differs from

the use of signatures in banking in, e.g., the United States."  *Id.*

Because Kurotaki does not contest the central argument of the government's

motion, it is GRANTED in that respect.  Kurotaki will not be permitted to argue or offer

evidence that the Japanese banking practice of using seals means, as a matter of law,

that he lacked signature or other authority over accounts at issue.

Consistent with the government's concessions at the hearing on this motion,

however, this ruling does not preclude Kurotaki from testifying about how, in his

experience, seals are used in the Japanese banking practice.  Nor does it preclude him

from testifying about what control, if any, he had over any such seals. And in closing

arguments, Kurotaki's counsel may argue that, as a matter of fact, Kurotaki lacked

sufficient control over the seals to qualify as signature or other authority—so long as he

does not argue or suggest that the jury must reach this conclusion as a matter of law.

This leaves the question of whether it would be appropriate for Kurotaki to make

arguments or offer testimony about his own subjective understanding of whether he

had signature or other authority over accounts, in light of the Japanese practice of using

seals. At the hearing on the motion, the government argued that Kurotaki's own

subjective understandings are not relevant to the question of whether he, in fact,

possessed signature or other authority. That is unquestionably true. Whether Kurotaki

had authority over accounts at issue does not depend on whether he understood

himself to have that authority. For that reason, Kurotaki will not be permitted to argue

that he actually lacked control of accounts just because he subjectively *thought* he lacked

such control.

That does not mean, however, that Kurotaki's understandings are necessarily

irrelevant. In this case, it would not be enough for the government to prove that

Kurotaki had an obligation to file FBARs (which subsumes the obligation to prove he, in

fact, had a financial interest or signature authority or other control over the accounts at

issue) to prevail. The government must also prove that Kurotaki acted willfully—

22

meaning, in this case, either recklessly, knowingly, or with willful blindness—in failing to file FBARs.

On that issue, Kurotaki might conceivably testify and argue that it was not reckless to believe that he had no obligation to file FBARs because, among other things, it would have been objectively reasonable under the circumstances to conclude that he lacked control over accounts at issue because of the use of seals in Japanese banking. Likewise, since knowledge and willful blindness allow for subjective considerations, Kurotaki could perhaps testify and argue that he did not subjectively believe that he had control over any of the relevant accounts because of the Japanese practice of using seals. And the government's motion—which asks to preclude Kurotaki from arguing that the use of seals means he lacked control as a matter of law—does not clearly contest these lines of argument and evidence concerning mens rea.

Accordingly, to the extent the government sought to preclude testimony or argument of this sort through its motion, the motion is DENIED in that respect. The Court reaches this conclusion not because the government's position on the issue is necessarily incorrect, but merely because it was not argued with sufficient clarity in its written submission. Moreover, at the hearing on this motion, Kurotaki's counsel appeared to disclaim any intention to argue that Kurotaki was not willful because of any misunderstanding about his financial interest or control over accounts. This issue, therefore, may not be likely to arise at trial. If it does, however, the government

remains free to raise objections to evidence or argument concerning mens rea within the more particularized context of the trial.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the government's Motion *in Limine* No. 3; and it GRANTS in part and DENIES in part the government's Motion *in Limine* No. 4.

IT IS SO ORDERED.

DATED:  November 27, 2024, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 22-00063 MWJS-WRP, *Osamu Kurotaki v. United States of America,* et al.; ORDER ON DEFENDANT'S MOTIONS IN LIMINE NOS. 3 AND 4

24